**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                                    :
CAROLYN L. GIBSON,                                  :
                                                    :
                            Plaintiff,              :          Civil No. 1:12-CV-01292 (RBK)
                                                    :
                  v.                                :          **OPINION**
                                                    :
MICHAEL ASTRUE                                      :
COMISSIONER OF SOCIAL                               :
SECURITY,                                           :
                                                    :
                            Defendant.              :
_____:

**KUGLER**, United States District Judge:

This matter comes before the Court upon the appeal of Carolyn L. Gibson ("Gibson") for

the review of a final determination of the Commissioner of Social Security ("Commissioner")

denying her application for Supplemental Security Income ("SSI"), under Title XVI of the Social

Security Act ("SSA"). For the reasons set forth below, the decision of the Commissioner is

vacated and remanded to the Administrative Law Judge ("ALJ") for further consideration.

**I.        BACKGROUND**

Gibson, a 36 year old woman, submitted an application for SSI on March 18, 2009. In the

application, Gibson alleged that she has been plagued by various disabilities since January 5,

2005. Specifically, Gibson alleged to have suffered from Bi-Polar Disorder, chronic pain in her

leg, neck and back, Post-Traumatic Stress Disorder ("PTSD"), and Depression. Gibson's prior

work history includes working as a cashier and a waitress. Gibson alleges that she is unable to

continue working in her previous positions, or any other position, because her physical and

mental conditions are likely to cause recurring absences, a need for daily naps, and regular

breaks, difficulty driving, loss of various "specific work activities," a limited range of motion in her neck, and frequent headaches.

### A.      Alleged Physical Limitations

On November 15, 2003, Gibson was admitted to the Virtua Memorial Hospital. She was discharged on November 20, 2003, with a physical diagnosis of neck pain as a result of a motor vehicle accident. (Admin. Rec. ("Rec.") at 206). On December 13, 2003, she was admitted to Lourdes Medical Center, complaining of pelvic and joint pain, and unspecified "chronic pain and multiple traumas." (Rec. at 233).

In May of 2008, Gibson was seen by Alan Dennison, M.D., of Cooper Family Medicine. After examining Gibson for an ear ache, Dr. Dennison prescribed Percocet to treat her "chronic neck and leg pain." (Rec. at 295). In October of 2008, Gibson was seen by Dr. Dennison's partner, Anjali Ray, M.D. Dr. Ray assessed Gibson following a motor-vehicle collision, and observed neck pain, limited range of motion, and bilateral neck tenderness. Dr. Ray also noted that the pain extended to Gibson's mid-back. (Rec. at 291). Gibson followed-up with Dr. Dennison five days later. In the follow-up examination, Dr. Dennison observed neck pain and decreased neck motion to the right. He further noted "muscle spasm and tenderness" in the right trapezius area, extending to the base of the skull on the right. (Rec. at 290). Gibson again followed-up with Dr. Dennison on February 3, 2009, with no change in her neck pain. (Rec. at 288).

On February 24, 2009, Gibson was seen by Marie Louis, M.D. for abdominal pain, which the doctor noted was "a new problem." After the examination, Dr. Louis made a note that Gibson's neck had normal range of motion and was supple. (Rec. at 285). On March 31, 2009, Hampton Counseling Center recommended an outpatient program for "chronic pain . . . herniated

disks, secondary to a motor vehicle accident." (Rec. at 279). Gibson was discharged from the outpatient care in late April of 2009. (Rec. at 278).  After one week, Gibson returned to Dr. Dennison, who observed neck pain and spasm, as well as tenderness in the right trapezius. (Rec. at 280).

On September 30, 2009, Nithyashuba Khona, M.D., of Best Med Consultants, PA, performed an orthopedic evaluation of Gibson, at the request of the State of New Jersey's Department of Labor and Work Force Development. (Rec. at 305). During the examination, Dr. Khona observed that Gibson's gait and station were normal, that she could walk on heels and toes, and could perform a squat. (Rec. at 306). She was also able to climb onto the operating table and change her clothes without requiring assistance. Id. She demonstrated no problems with her hand strength and dexterity. Id. Gibson displayed full range of motion of her shoulders bilaterally, elbows, forearms, wrists, fingers, hips, ankles, and knees. Id. Dr. Khona also noted that her cervical spine showed "full flexion, extension, and lateral flexion bilaterally." Id. Gibson also demonstrated "full rotary movement bilaterally, and no cervical or paracervical pain, spasm or trigger points." Id.  As for Gibson's spine, thoracic and lumbar regions, Dr. Khona found 75% flexion and extension, as well as full later flexion bilaterally. (Rec. at 307). He found full rotary movement bilaterally. Id. He found no SI joint or sciatic tenderness. Id. He found no spasms, scoliosis, or kyphosis. Id. Ultimately, Dr. Khona's evaluation concluded that there were "no physical findings except for [Gibson's] subjective complaints of pain." Id.

Dr. Ray examined Gibson again on June 4, 2010, to treat dysuria and a burn on her leg that she allegedly sustained in an unspecified accident involving a motorcycle. (Rec. at 390). Dr. Ray did not report any further physical distress during that examination. On June 23, 2010, Gibson was evaluated by Dr. Ray a third time. Dr. Ray noted that Gibson had a supple neck with

3

normal range of motion. (Rec. at 387). Yet, on July 19, 2010, when Dr. Ray again observed Gibson, she found neck pain and muscular tenderness. (Rec. at 384). Dr. Ray also noted "severe pain in the cervical spine after going on [a] boat." (Rec. at 383). After performing a physical exam, however, Dr. Ray found no tenderness of the spinous processes. (Rec. at 384). On November 12, 2010, Gibson was once more examined by Dr. Ray, after she fell down while on the stairs. (Rec. at 364-5). Dr. Ray noted that the fall "provoked her neck pain." (Rec. at 363-5). Finally, on December 7, 2010, Gibson sought a comprehensive evaluation of her health in connection with her SSI claim. In regards to her physical health, Dr. Dennison reported "chronic neck problems" and a "decreased [range of motion] of the neck and tenderness of the paraspinal muscles." (Rec. at 362).

      **B.**     **Alleged Mental Impairments**

On November 15, 2003, during her hospitalization at Virtua Memorial Hospital, Gibson was diagnosed with bipolar disorder, with mixed and severe episodes. (Rec. at 206). According to the discharge report, Gibson exhibited a variety of "difficulties apparently related to manic symptoms including impulsivity, distractibility, irritability, labile mood and very poor judgment." Id. She was discharged with an "improved condition." Id. Gibson next spent six-days in Lourdes Medical Center, from December 13 to December 19, 2003. While hospitalized, she was diagnosed and treated for bipolar disorder and alcohol abuse.

On November 4, 2004, Gibson was admitted to the Kennedy Health System. Upon admittance, she was diagnosed with "dysthymic disorder, major depressive disorder and PTSD, as well as alcohol dependence." (Rec. at 246). When she was discharged, she was diagnosed with "dysthymic disorder, PTSD, alcohol dependence and rule out ADHD." (Rec. at 247). The observing doctor noted that Gibson displayed "delusions/illusions" and "obsessive/compulsive

thoughts." (Rec. at 252). However, the doctor also noted that her affect was "appropriate," her speech was "clear and coherent," her insight was good and her judgment was fair. Gibson was again admitted to the Kennedy Health System, on April 9, 2008. While there, she was diagnosed with Bipolar II Disorder, Major Depressive Disorder (illegible), panic disorder with agoraphobia, and PTSD. (Rec. at 261). On December 16, 2008, Gibson was again diagnosed with PTSD by Cooper Hospital's OB/GYN department. The staff attributed Gibson's PSTD to an alleged history of molestation and rape. (Rec. at 335).

After Gibson's evaluation with Dr. Dennison on February 3, 2009, he determined that she suffered from Bipolar Disorder, which manifested in the form of chronic stress and anxiety. (Rec. at 288). Due to panic attacks and anxiety, Gibson was seen by Dr. Ray on March 17, 2009. (Rec. at 282). She claimed an inability to sleep and auditory and visual hallucinations. Id. Dr. Ray strongly urged her to seek immediate mental healthcare. (Rec. at 283).

Gibson was admitted to Hampton Counseling Center on March 31, 2009. (Rec. at 278). Until she was discharged on April 28, 2009, Gibson participated in a number of group treatments, with the reported goal of decreasing symptoms associated with depression, anxiety, and PTSD. Id. At the time of her discharge, the Center diagnosed Gibson with "Depression, Not Otherwise Specified,"[1] as well as PTSD and alcohol abuse. Id. Gibson was readmitted to Hampton on May 12, 2009, again alleging symptoms of PTSD, depression, and anxiety. (Rec. at 296). Her discharge summary again noted the diagnosis of Depressive Disorder, Not Otherwise Specified, and Anxiety Disorder, Not Otherwise Specified. Id.

---

[1] "Depressive Disorder Not Otherwise Specified" (DD-NOS) is listed under code 311 of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). The diagnosis includes disorders with depressive features that do not meet the criteria of other listed depressive disorders. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 311 (4th ed. 2000).

On September 23, 2009, Gibson met with Wm. Dennis Coffey, PsyD., for a mental status exam. (Rec. at 299). During the examination, Dr. Coffey observed that Gibson was impatient, not-forthcoming and very agitated. (Rec. at 302). He also noted that Gibson did not display any obsessive or compulsive behavior, suicidal or homicidal ideation, or symptoms of a thought disorder. Id. While her insight was poor, Dr. Coffey noted that she did not present with inadequacies in her understanding, memory, concentration, mental pace, and persistence. Id. Ultimately, he diagnosed Gibson with Depressive Disorder, Not Otherwise Specified, and Borderline Personality Disorder. (Rec. at 303). He recommended that Gibson continue with her current treatment, and that she consult with a psychiatrist and therapist. Id.

On October 5, 2009, Robert Eckardt, Ph.D., a state agency psychological consultant, provided a psychiatric review technique based on the existing medical evidence. (Rec. at 312). While Dr. Eckardt noted an unspecified depressive disorder, a substance abuse problem, and a personality disorder affecting her relationships, he determined that Gibson displayed only moderate mental limitations. (Rec. at 315-22).

On June 23, 2010, Gibson was again evaluated by Dr. Ray, who made note of her PTSD. (Rec. at 386). Dr. Ray repeated this evaluation on November 11, 2010, finding that Gibson suffered from panic attacks, bipolar disorder, and PTSD. (Rec. at 365). Dr. Dennison's final evaluation of Gibson dated December 7, 2010 again listed panic attacks, bipolar disorder, and PTSD as "active problem[s]." (Rec. at 362). In conjunction with the final evaluation, Dr. Dennison responded to a Medical Source Statement related to Gibson's SSI claim. In his response to the statement, Dr. Dennison diagnosed Gibson with PTSD, depression, and anxiety. (Rec. at 354).

Finally, on December 28, 2010, Gibson was admitted to Lourdes Medical Center, complaining that she was "overwhelmed with depression." (Rec. at 399). The Center determined that she was suffering from positive suicidal ideation and kept her until December 31, 2010, when they felt the threat of suicide had passed. Id. Upon discharge, the Center diagnosed her with major depressive disorder and "rule out posttraumatic stress disorder". (Rec. at 399-400).

### C.      Administrative Law Judge Decision

Gibson's initial SSI claim was denied on October 22, 2009. After submitting a request for reconsideration, Gibson's claim was again denied on February 25, 2010.  On March 31, 2010, Gibson submitted a request to be heard by an ALJ and have her claim reviewed. A hearing was held on January 24, 2011, in front of ALJ Frederick Timm. On May 11, 2012, the ALJ denied her SSI claim after finding that the Gibson was "not disabled," as defined under the SSA. Thereafter, the Appeals Council declined to review the ALJ's decision, making that decision the final decision of the Commissioner.

In making his determination, the ALJ first decided that Gibson had not engaged in any substantial gainful activity since her application date of March 18, 2009. (Rec. at 16). The ALJ also found that Gibson's leg and neck pain, her Depressive Disorder not otherwise specified, and her Borderline Personality Disorder were severe enough to significantly limit her physical and mental ability to perform basic work activities. Id. In contrast, he found that Gibson's alcohol and drug abuse did not meet the same level of severity. (Rec. at 17). No determination was made regarding the severity of Gibson's alleged PTSD.

While the ALJ decided that Gibson's pain, Depressive Disorder, and Borderline Personality Disorder were severe enough to limit her ability to work, he ultimately determined that the severity of these conditions was not so great as to meet or equal any of the impairments

7

listed in the SSA. Id. He concluded that Gibson's leg, neck and back pain failed to meet the criteria under listing 1.04. Id. Furthermore, he concluded that Gibson's mental impairments did not meet or equal the criteria of listings 12.04 or 12.06, which cover Affective Disorders and Personality Disorders. (Rec. at 17-8). No further section 12.00 listings were discussed.

In assessing Gibson's Residual Functional Capacity ("RFC"), the ALJ reviewed the medical record, as well as the testimony offered at the hearing. The ALJ determined that, although Gibson's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible when compared with the medical record as a whole. The ALJ concluded that Gibson is limited to:

> [F]requent balancing and occasional stooping, kneeling, crawling, crouching, bilateral overhead reaching, and climbing of stairs and ramps. She is further limited to simple, repetitive tasks, no significant interatction with the public and only occasional interaction with supervisors and co-workers. [Gibson] requires a stable workplace with few, if any, changes of setting, processes and tools.

(Rec. at 19).

In evaluating the RFC, the ALJ relied heavily on the medical reports by Dr. Coffey and Dr. Khona, while also referring to Gibson's 2010 hospitalization at Lourdes Medical Center. (Rec. at 20-2). The ALJ concluded that Dr. Dennison's medical source statement deserved "little weight," as it was "significantly inconsistent" with his practice's treatment notes and the above mentioned medical reports. Id. While the ALJ failed to explicitly draw any direct comparisons between Dr. Dennison's medical assessment and the medical reports from the consulting physicians, he did decide that the treatment notes from Dr. Dennison's practice only revealed "occasional acute pain in the claimant's neck along with a history of non-compliance with medical orders." (Rec. at

22-3). Ultimately, Dr. Dennison's assessment was given "limited deference," when the ALJ included a number of unspecified "postural limitations" in Gibson's RFC.

In light of these findings, the ALJ determined that there was no medical evidence on record that supported Gibson's allegations of chronic pain. Id. Furthermore, the ALJ found that Gibson's alleged physical and mental disabilities were not consistent with her activities of daily living, effectively discrediting her subjective complaints entirely. Id. Ultimately, the ALJ concluded that, while Gibson cannot perform her past relevant work, she "would be able to perform the requirements of representative occupations." (Rec. at 25). Consequently, the ALJ held that Gibson was not disabled under the SSA, and was not eligible for SSI benefits.

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360)).

Nevertheless, the reviewing court must be wary of treating "the existence [or nonexistence] of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114). As such, District Court review of the final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." Kent, 710 F.2d at 114.

## III.    DISCUSSION

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore, eligible for SSI benefits. 20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner must first determine whether the claimant is currently engaged in a "substantial gainful activity." If the claimant is currently engaged in substantial gainful activity then she is ineligible for SSI benefits. 20 C.F.R. § 404.1520(a). The Commissioner then ascertains whether the claimant is suffering from any severe impairment. Under the SSA, an impairment is "severe" when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

If the Commissioner finds that the claimant's condition is severe, the Commissioner evaluates whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the claimant's physical or mental conditions meet or equal the criteria for any impairment listed in the SSA, then it is presumed that the claimant is disabled and entitled to benefits. If not, the Commissioner continues on to step four to evaluate the claimant's RFC and determines whether

the RFC would entitle the claimant to return to her "past relevant work." 20 C.F.R. §
404.1520(e). If the claimant is capable of returning to past relevant work, then they are ineligible
for SSI benefits. If the ALJ finds the claimant is unable to resume past relevant work, the burden
then shifts to the ALJ to demonstrate the claimant's capacity to perform work available "in
significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. §
404.1520(f)).

Here, Gibson asserts that the ALJ 1) improperly discredited Dr. Dennison's opinion; 2)
failed to adequately assess her PTSD; and 3) failed to give her testimony the appropriate weight
and consideration. The Court will address these arguments in turn.

### A.      The ALJ's Weighing of Dr. Dennison's Medical Evaluation

First, Gibson alleges that the ALJ erred by failing to afford the proper weight to Dr.
Dennison's medical assessment. As Gibson's treating physician, Dr. Dennison's medical
assessment is entitled to "great weight," since his "opinions reflect expert judgment based on a
continuing observation of [Gibson's] condition over a prolonged period of time." Brownawell v.
Commissioner of Social Security, 554 F.3d 352, 355 (3d. Cir. 2008). Indeed, Third Circuit case-
law mandates that the Commissioner give greater weight to Dr. Dennison's medical assessment
than to the findings of a physician who has examined the claimant only once or not at all. Mason
v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). While the ALJ is entitled to make a credibility
determination, he may decide to reject Dr. Dennison's opinion outright "only on the basis of
contradictory medical evidence and not due to his or her own credibility judgments, speculation
or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). When there is contradictory
medical evidence in the record, the ALJ must provide a careful evaluation and sufficient

explanation to support why the treating physician's opinion was not given controlling weight. Griffies v. Astrue, 855 F.Supp.2d 257, 270 (D. Del. 2012).

       **1) The ALJ's Reliance on the Consultative Medical Opinions**

       To justify giving Dr. Dennison's assessment "little weight," the ALJ reasoned that his medical opinions were "significantly inconsistent with the opinions of the consultative examiners." This is not a sufficient explanation to support the ALJ's determination that the consultative assessments were entitled to greater weight than Dr. Dennison's opinion.

       The ALJ decided to give the consultative examiners greater weight than Gibson's treating physician after he summarized each medical opinion and abruptly concluded that they were "significantly inconsistent." When a treating physician's medical assessment is given less weight, the Third Circuit is primarily concerned with the reasoning behind crediting the contradictory evidence. See Morales, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason . . . [such as] speculative inferences from medical reports"). When evaluating the weight to afford a treating physician, the Court of Appeals for the Third Circuit has asked ALJs to apply factors listed in 20 C.F.R. § 404.1527(c)(1-6), which include the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationships, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. Russo v. Astrue, 421 Fed.Appx. 184, 191 (3d Cir. 2011); Griffies, 855 F.Supp.2d at 272.

       The Commissioner correctly argues that the ALJ has the ultimate responsibility to choose which medical assessment to rely on when there is inconsistent medical evidence in the record.

However, as this Circuit's decisions consistently demonstrate, it is not enough to point to medical evidence that the ALJ deems to be inconsistent with the treating physician's opinion. To satisfy the substantial evidence standard, it is critical that an ALJ provides sufficient and appropriate justification for crediting the medical opinions that contradict the treating physician. In this case, the ALJ provided no rationale, evaluation, or justification, for awarding greater weight to the State examiners' contradictory assessments. Without such explanation, a reviewing court cannot determine whether the ALJ inappropriately formed a lay opinion of the medical evidence from the opinions, or whether he compared the proper credibility factors.  Because the decision lacks the required explanation, this Court has no way of deciding if the decision to afford Dr. Dennison's less weight was based on improper "speculative inferences from medical reports" or a proper assessment of the medical evidence using the factors provided in the SSA.

Furthermore, based on the record, the ALJ should have provided further justification for crediting the opinions of Dr. Khona and Dr. Coffey over the opinions of Dr. Dennison. The Third Circuit has previously held that a consulting physician's opinion is not necessarily contradictory when the record indicates that it has not considered factors that contributed to the treating physician's assessment. <u>Allen v. Bowen</u>, 881 F.2d 37, 42 (3d Cir. 1989). As the record indicates, both consulting physicians examined Gibson in September of 2009. In the following year, Gibson experienced a number of incidents which affected her medical condition. In June of 2010, Dr. Ray noted that Gibson had sustained burns due to a motorcycle accident. In July of 2010, Dr. Ray noted severe cervical pain following an incident on a boat. In November of 2010, Dr. Ray noted a provocation of Gibson's neck pain following a fall down the stairs. None of these incidents were considered or evaluated by the consulting physicians. The consultative medical assessments concerning Gibson's pain, range of motion, gait, and flexion did not take

into account significant events contributing to her alleged physical limitations. Consequently, further explanation is required for the Court to determine whether substantial evidence supports the conclusion that the consultative assessments deserved of greater weight.

### 2) The ALJ's Reliance on Medical Treatment Notes

The ALJ also decided that Dr. Dennison's final assessment was "at odds with his own practice's treatment notes." The Third Circuit has previously admonished the use of treatment notes to discredit a physician's conclusive medical opinion regarding a claimant's disability.[2] In Brownawell, the Court held that it was improper for an ALJ to rely on a physician's treatment notes to discredit his final medical assessment, "noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work." Brownawell, 554 F.3d at 356. The Court reasoned that the two are "not necessarily contradictory," since treatment notes merely describe the claimant's "condition at the time of [the] examination," while the final report is an "assessment of [the claimant's] ability to function in a work setting." Id.

Furthermore, an ALJ may not rely solely on the favorable sympotomology found in treatment reports as contradictory medical evidence. The medical record must be read as a whole, and the ALJ must explain his rejection of conclusions and medical symptomology in the reports that lend support to the treating physician's opinion. Morales, 225 F.3d at 318. In

---

[2] The Court recognizes that the Court of Appeals has previously allowed the use of medical treatment notes as contradictory evidence in some circumstances. However, those cases are not controlling here. A claimant's treatment notes may contradict a treating physician where, when analyzed as a whole, they form an inconsistent medical conclusion regarding the claimant's alleged disability. See Dula v. Barnhart, 729 Fed.Appx. 715, 719 (3d. Cir. 2005) (finding that an ALJ's reliance on treatment notes to discredit a treating physician was proper because those notes formed a medical conclusion regarding the claimant's alleged bipolar disorder, when read as a whole); See Torres v. Barnhart, 139 Fed.Appx. 411, 414 (3d. Cir. 2005) (finding that it was not improper to use treatment notes as contradictory medical evidence where the ALJ concluded that the notes, when read as a whole, evaluated and documented marked improvement in the disability); See Humphreys v. Barnhart, 127 Fed.Appx. 73, 76 (3d Cir. 2005) (relying on treatment notes to discredit a treating physician when those notes were the results of examinations and tests meant to diagnose and treat the disabilities at issue in the claim).

Morales, the ALJ rejected the opinion of the treating physician based on speculation in some of the medical reports that the claimant was malingering. Based on this report, the ALJ rejected the treating physician's opinion, after concluding that the claimant's alleged disability was not credible. The Court concluded that the ALJ had improperly supplanted the treating physician's assessment with his own lay opinion, by making a medical determination based only on favorable evidence in the treatment records.

In the present matter, the ALJ considered treatment notes developed during separate evaluations in 2010. (Rec. at 22). According to the ALJ, notations in these reports concerning Gibson's gait, range of motion, strength, and pain are inconsistent with Dr. Dennison's final assessment that Gibson's "pain and fatigue are significant enough to prevent her from performing normal, full-time work activities." (Rec. at 22-23). This reasoning fails to evaluate the medical reports as a whole and mischaracterizes the conclusiveness of the treatment notes. Many of the treatment notes relied on are not necessarily inconsistent with the final assessment, since the observations the ALJ cited were made during the treatment of ailments entirely unrelated to the alleged disabilities. One treatment report noted that, at the time of the examination, Gibson was "in no distress." (Rec. at 23). However, this report was made for the purpose of treating dysuria and a serious burn, and when read as a whole does not lend itself to a conclusion that is inconsistent with Dr. Dennison's physical assessment. Id. Similarly, a treatment note that Gibson "reported no flank pain . . . [or] distress other than a burning sensation while urinating" does not contradict a finding of disability, since the report was made while treating a Urinary Tract Infection. Id. The ALJ's reliance on these treatment notes does not constitute substantial evidence, as they do not amount to contradictory medical evidence.

15

Moreover, the ALJ's reliance on the treatment notes amounts to forming an improper lay opinion, as he failed to discuss or give weight to the medical evidence in the treatment history that supported Dr. Dennison's assessment. For example, the ALJ noted that Gibson presented subjective "complaints of severe pain in the cervical spine after going on [a] boat," yet he chose to ignore the physician's findings of muscle tenderness in her neck. (Rec. at 384).  Instead, he relied on notations in that report that Gibson "exhibited normal muscle tone, coordination and gait, and no weakness" and formed an independent medical judgment based on this limited symptomology, rather than assessing the report as a whole. (Rec. at 23). Similarly, the ALJ offered, as contradictory medical evidence, Dr. Ray's treatment notes from November 12, 2012, which observed a lack of tenderness in the spinous process after Gibson fell down the stairs. Id. However, the ALJ failed to note that the report ultimately diagnosed Gibson with "neck pain" and prescribed her medication to treat it. (Rec. at 366). In both of these instances, the ALJ relied on observations in the treatment notes that tended to discredit Dr. Dennison, but ignored evidence that would lend support to his conclusions. This reasoning essentially supplants the treating physician's medical opinion with the ALJ's lay opinion, and the Third Circuit has held that this practice does not satisfy the substantial evidence standard. The ALJ's improper reasoning and reliance on non-contradictory treatment notes constitutes reversible error.

### B.        The ALJ's Assessment of Gibson's Claim of PTSD

Gibson further argues that the ALJ failed to provide proper explanation regarding the weight given to the evidence supporting her alleged Post-Traumatic Stress Disorder ("PTSD"). In order for the Court to determine whether the final decision is supported by substantial evidence, the ALJ is expected to provide a "clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). To that end, the ALJ must

16

provide, "not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected." Id. at 706. Absent a proper explanation, the district court cannot properly review the determination, since it would be unable to ascertain "if significant probative evidence was not credited or simply ignored." Id. at 705.

Gibson contends that the ALJ erred by failing to consider her alleged PTSD during step two and all subsequent stages of the evaluation process. For the district court to decide that the ALJ's decision at step two was supported by substantial evidence, it must find that the probative evidence that supported Gibson's claim was considered and properly rejected. See Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999)  ("When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason."). Accordingly, the Court requires "an explanation from the ALJ of the reason why probative evidence has been rejected . . . so [it] can determine whether the reasons for rejection were improper." Cotter, 642 F.2d at 706-7. Therefore, in order to find that the evidence of Gibson's PTSD was properly rejected, the Court must be able to identify the ALJ's reason for rejecting it.

Because ALJs are required to "provide some explanation for a rejection of probative evidence which would suggest a contrary [determination]," a final decision cannot be upheld if it fails to acknowledge the existence of such contradictory evidence. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). In Adorno, the Court of Appeals vacated an ALJ determination for "not otherwise explain[ing] his reasons for not mentioning" a medical note that would have supported the claimant's allegations. Id. Similarly, in Cotter, the ALJ failed to discuss medical evidence that "was probative and supportive of Cotter's claim which conflicted with the medical testimony accepted by the ALJ." Cotter, 642 F.2d at 707. The Court held that the "failure to explain his implicit rejection of the evidence or even to acknowledge its presence was error." Id.

17

The Court finds that the provided examination of the evidence regarding Gibson's PTSD was wholly inadequate. After a close review, it is clear that the record contains several reports that support Gibson's allegations of PTSD in explicit terms, which the ALJ failed to discuss. The record includes reports from:

- Kennedy Health System, dated November 4, 2004, with an admission diagnosis that includes "PTSD" (Rec. at 246);
- Kennedy Health System, dated April 9, 2008, with a principal diagnosis that includes "PTSD" (Rec. at 261);
- Cooper Health System's OB/GYN, dated December 16, 2008, with an "Impression" that includes "PTSD mollestation [sic]" (Rec. at 335);
- Hampton Counseling Center, dated April 28, 2009, with a discharge diagnosis that includes "Posttraumatic Stress Disorder" stemming from "severe past trauma" (Rec. at 278);
- Hampton Counseling Center, dated May 22, 2009, with a list of "Treatment Goals" that includes "decreased symptoms of PTSD" (Rec. at 296);
- Dr. Anjali Ray, dated June 23, 2010, with a notation concerning "PTSD from multiple traumatic events" (Rec. at 386).

Nowhere in his decision does the ALJ explain the weight afforded to these reports, offer any explanation for their rejection, or acknowledge their presence in the record.  No discussion of this evidence, or any evidence pertaining to PTSD, appears at step two of the assessment, despite its obvious value to Gibson's claim that her ability to work was limited by this condition. None of these reports were referenced in step three of the evaluation.[3] Similarly, no reference was made to this evidence during Gibson's RFC determination, despite its support of Dr. Dennison's final assessment and Gibson's subjective complaints. Ultimately, without the ALJ even mentioning obviously probative evidence at any stage of the evaluation, the Court has no way of knowing whether it "was not credited or simply ignored," which makes a proper review of the record impossible. Cotter, 642 F.2d at 705.

---

[3] While not raised by the Plaintiff's brief, the Court notes that none of Gibson's evidence was evaluated using the criteria of listing 12.06, which is used to evaluate the severity of "Anxiety Disorders," such as PTSD. 20 CFR Part 404, Subpart P, App. 1, § 12.06.

The Commissioner argues that the ALJ properly considered the medical evidence and determined Gibson's severe impairments at step two. The Commissioner believes that a review of the statutory requirements will demonstrate the ALJ was correct not to include the alleged PTSD as a severe impairment.  This assertion mischaracterizes the pertinent issue. As the law of the Circuit demonstrates, if there is evidence that supports Gibson's claim in the record, it is not enough for the reviewing court to find evidence that also supports the ALJ's decision. Unless the ALJ also provides an explanation for rejecting the evidence that is contrary to his finding, the Court cannot find that his decision is supported by substantial evidence, regardless of the weight of the supporting evidence in the record. See Kent, 710 F.2d at 114 ("A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.").

The Commissioner asserts that the ALJ's decision demonstrates that he was aware of Gibson's alleged PTSD and provided substantial evidence to support the finding that it is not severe. The Commissioner suggests that the detailed review of Dr. Coffey's psychological evaluation is sufficient to find that his decision regarding Gibson's alleged PTSD was supported by substantial evidence. The Commissioner is mistaken. In Cotter, the Third Circuit provided an illuminating hypothetical that is analogous presently. The Court reasoned:

> If the record contained the evidence of six medical experts, one of whom supported the claimant and five of whom did not, it would be of little assistance to our review function were the ALJ merely to state that s/he credited the one supporting expert because that evidence adequately demonstrated disability, but failed to either mention or explain why the evidence of the other five experts was rejected. In that instance, we would not know whether the evidence of the five experts was rejected because the ALJ found it lacking in credibility, irrelevant, or marred by some other defect.

Cotter, 642 F.2d at 706. The fact that the ALJ chose to rely on Dr. Coffey's assessment does not remedy the deficient rejection of the opposing medical evidence, particularly because Dr.

Coffey's medical report made no findings regarding Gibson's alleged PTSD. Where a medical report is silent on a disputed disability, the Third Circuit has declined in the past to interpret that silence as affirmative evidence that the consultative examiner gave the allegations no weight. Allen v. Brown, 881 F.2d 37, 41-2 (3d Cir. 1989). Instead, the Court of Appeals has held that the "proper inference from the report's silence is that the consulting physician simply did not consider the issue." Id. at 42. Because of this, it would be improper to hold that Dr. Coffey's silence on the issue constitutes substantial evidence in support of the ALJ's rejection of PTSD-related evidence.

The Commissioner also argues that the ALJ's rejection of Dr. Dennison's final medical opinion provides sufficient support for his rejection of her PTSD allegations. However, the reasons for rejecting it do not implicitly apply to the other evidence that supports Gibson's allegations regarding her PTSD.[4] Assuming, *arguendo*, that Dr. Dennison's medical opinion had been disposed of properly, the Cotter hypothetical still applies.  Whatever defect the ALJ relied on to reject the probative exhibits must be explained thoroughly enough to allow the Court to review the reasons for the rejection. To hold that a decision is supported by substantial evidence without "sufficiently [explaining] the weight . . . given to obviously probative exhibits . . . approaches an abdication of the Court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Finally, the Commissioner insists that the ALJ clearly considered the allegations of PTSD during step three of the evaluation. Specifically, the Commissioner highlights the ALJ's consideration of Gibson's "function report" from December 24, 2009. While attempting to

---

[4] For the same reason, the Court also rejects the suggestion that consideration of the medical report from Lourdes Medical Center, dated December 28, 2010, supports the rejection of the probative evidence that does not appear in the decision.

determine if Gibson's mental impairments met or equaled any of the listed impairments, the ALJ noted that Gibson "alleges that she does not drive due to Post-Traumatic Stress Disorder." (Rec. at 17). This is the only explicit acknowledgement of PTSD in the ALJ's decision. Regardless, the Commissioner's reliance on this limited acknowledgment again mischaracterizes the ALJ's responsibility. A reviewing court cannot find that a decision is supported by substantial evidence based solely on the recognition that opposing probative evidence exists in the record. When probative evidence conflicts with the ALJ's ultimate conclusions, the ALJ's bifurcated responsibility requires acknowledging the evidence and explaining its treatment. See Adorno, 40 F.3d at 48 ("The Secretary . . . must consider all the evidence and give some reason for discounting the evidence she rejects"). Because of this, the ALJ's discussion of the "function report" is inadequate, and his failure to acknowledge the numerous reports in support of Gibson's PTSD allegations constitutes reversible error.

### C.      The ALJ's Credibility Determination of Gibson's Subjective Testimony

Finally, Gibson alleges that the ALJ mistakenly discredited her testimony at the hearing. The Third Circuit has held that an ALJ must "give great weight to a claimant's subjective testimony when that testimony is supported by medical evidence." Clark v. Barnhart, Fed.Appx. 211, 215 (3d Cir. 2006) (citing Schaudeck v. Comm'r of Social Sec., 181 F.3d 429, 433 (3d Cir. 1999)). While an ALJ is entitled to reject a claimant's testimony if he finds they lack credibility, his decision to do so "must contain a thorough discussion and analysis of the objective medical and the other evidence." Schaudeck, 181 F.3d at 433. An ALJ must consider the medical support of the subjective complaints before disregarding them, or else the district court cannot find that the credibility determination is supported by substantial evidence. Id.

In the present case, the ALJ determined that "the claimant's allegations of consistent pain are not supported by the medical evidence of record." (Rec. at 23). Since this Court believes that the medical evidence was not properly evaluated, upon remand, the ALJ must revisit this credibility determination. As was previously discussed, the ALJ provided an insufficient evaluation of the medical evidence when he afforded Dr. Dennison's medical opinion less weight and failed to discuss evidence of Gibson's alleged PTSD. While the ALJ may still find that Gibson's subjective complaints were unsupported, he must make this determination after reevaluating the weight of Dr. Dennison's medical reports and demonstrating proper consideration of the evidence that supports her claims for PTSD.

**IV.     CONCLUSION**

For the reasons discussed above, the Court cannot find that the ALJ's determination is supported by substantial evidence. As a result, the Court will vacate the ALJ's decision and remand the matter to the ALJ for further proceedings consistent with this Opinion. An appropriate order shall enter today.

Dated:  3/18/2013                                          /s/ Robert B. Kugler
                                                           ROBERT B. KUGLER
                                                           United States District Judge

22